UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

RAYMOND G. GABRIEL,
KIMBERLY A. GABRIEL
    Plaintiffs,

v.

LIBERTY MUTUAL FIRE INSURANCE
COMPANY,
    Defendant.

No. 3:14-cv-01435-VAB

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Raymond and Kimberly Gabriel sued Liberty Mutual Fire Insurance Company after Liberty Mutual denied coverage for crumbling basement walls in the Gabriel's Ellington Home. The lawsuit alleged breach of contract, breach of the covenant of good faith and fair dealing, and unfair and deceptive trade practices. Liberty Mutual now moves for summary judgment on all counts.

For the reasons discussed below, Liberty Mutual's motion for summary judgment is **GRANTED** in part and **DENIED** in part.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. FACTUAL ALLEGATIONS

In 2006, Raymond and Kimberly Gabriel ("Plaintiffs" or the "Gabriels") bought a home at 4 Grant Road in Ellington, Connecticut, Def. Stmt. Material Facts ("Def. SMF") ¶ 2, ECF No. 51, and have lived there ever since. Raymond Gabriel Dep. at 32, Def. SMF, Ex. J ("Raymond Gabriel Dep."). When the Gabriels bought the property, built in 1984, they hired a home inspector. Raymond Gabriel Dep. at 9:1-10. The home inspector addressed several cracks in the basement walls and suggested that the Gabriels consult with an engineer about them. Raymond

1

Gabriel Dep. at 9-17; Kimberly Gabriel Dep. ("Kimberly Gabriel Dep.") at 11:9-17, Pls. Stmt. Material Facts, Ex. AA, ECF No. 55-1. According to the Gabriels, "[w]e consulted with a local contractor who told us that there was nothing to worry about and the condition was normal." Interrogatories at 9, Def. SMF, Ex X.

The Gabriels obtained homeowners' insurance from Liberty Mutual ("Liberty" or "Defendant"). Their coverage began shortly after they purchased the property in 2006 and continued until after they filed the Complaint. Pls. Stmt of Material Fact ("Pl. SMF") ¶ 7-8, ECF No. 55; *see generally* LibertyGuard Deluxe Homeowners Policy ("Policy"), Def. SMF, Ex. A. The operative policy in this case extended from October 18, 2013 until October 18, 2014, and covered the "risk of direct loss" to the dwelling, other structures, and personal property owned by the Gabriels. *Id* at § 1.

The policy also included a number of exclusions. First, the policy excluded coverage for damages caused by "freezing, thawing, pressure, or weight of water or ice [to a] foundation, retaining wall, or bulkhead." Second, it excluded coverage for "inherent vice, latent defect, mechanical breakdown;" and "settling, shrinking, bulging or expansion, including resultant cracking, of pavements, patios, foundations, walls, floors, roofs, or ceilings." *Id.* at 6.

As a general matter, the policy also excluded coverage involving collapse. *Id. at* 1. The policy did, however, contain a carve-out for certain types of collapse under a separate section, *Id.* at 6:

> We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following:
> a. Perils Insured Against in COVERAGE C - PERSONAL PROPERTY. These perils apply to covered buildings and personal property for loss insured by this additional coverage;
> b. Hidden decay;
> c. Hidden insect or vermin damage;
> d. Weight of contents, equipment, animals or people;

  e. Weight of rain which collects on a roof; or
  f. Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.
  Loss to an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under items b., c., d., e., and f. unless the loss is a direct result of the collapse of a building
  Collapse does not include settling, cracking, shrinking, bulging or expansion.
  This coverage does not increase the limit of liability applying to the damaged covered property.

*Id.* at § 8.

  In 2014, the Gabriels began having problems with one of the doors in the first floor. Raymond Gabriel Dep. at 20:1-5. Several of the doors and windows on the first floor had trouble closing, and the floors were uneven in several different places. *Id.* at 31-32. As a result, Mr. Gabriel examined the floor joists in the basement. *Id.* at 20:1-5. He noticed "there seemed to be more cracks and they seemed to be different than what I recalled." *Id.* The Gabriels then consulted with several contractors about the cracks; the contractors informed them that their basement might be constructed with defective concrete from the JJ Mottes Concrete Company. *Id.* at 31:1-9.

  One of these contractors, William Neal, an engineer, wrote that "the most likely cause of the foundation distress" was a "chemical reaction between alkali aggregate and silica in the concrete mix. It typically causes this type of distress 15 to 20 years after the foundation is poured. The [reaction] will continue to deteriorate the concrete and the basement walls will continue to bulge inward until they structurally fail." Neal Report at 1, Def. SMF, Ex. G.

  The Gabriels then filed a claim with Liberty Mutual in early July, 2014. Def. SMF ¶ 8. On July 22, 2014, five days after a special investigator from Liberty Mutual visited the property and documented the damage to the basement, Liberty Mutual denied coverage for the claim. Def. SMF ¶¶ 10-11. In its denial letter, the company cited the insurance policy's collapse provision,

as well as several other exclusions related to water damage, earth movement, and construction defects. *Id*.

B.   **PROCEDURAL HISTORY**

On October 14, 2014, the Gabriels filed the Complaint in this case. Count I alleges breach of contract, Count II alleges breach of the implied covenant of good faith and fair dealing, and Count III alleges violations of the Connecticut Unfair Insurance Practices Act, Conn. Gen. Stat. § 38a-815, et seq. ("CUIPA") and the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a, et seq. ("CUTPA"). *Id.*

Liberty Mutual moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss the Complaint in its entirety for failure to state a claim. *See* Def. Mot. to Dismiss, ECF No. 13. The Court denied the Motion on September 28, 2015, finding that the Gabriels had plausibly alleged all three counts. *See Gabriel v. Liberty Mut. Fire Ins. Co.*, No. 3:14-cv-01435-VAB, 2015 WL 5684063 (D. Conn. Sept. 28, 2015). The Court also denied certifying the question of what constituted a substantial impairment to the Connecticut Supreme Court, and instead found that Plaintiffs had adequately alleged a collapse. The Court further determined that the terms "foundation" and "retaining wall," as used in the policy, were ambiguous and therefore construed them against the Defendant. The Court also denied the motion to dismiss claims related to the breach of the implied warranty of good faith and fair dealing, and CUTPA and CUIPA.

The parties proceeded with discovery, and both Liberty Mutual and the Gabriels engaged experts. The Gabriels retained David Grandpré, an expert who has worked on a number of the crumbling concrete cases in the District of Connecticut. Letter from Eric Grandpré to Michael Parker ("Grandpré Report"), ECF No. 55-2. Mr. Grandpré visited the Gabriels' residence on

4

September 12, 2014, and observed "extensive irregular horizontal, vertical, and diagonal cracks in a map pattern." *Id.* at 2. He also noted that the basement walls were "bulging inward" and, in several places, "bulging upward." *Id.* at 2-3. He ultimately concluded:

> The concrete used at the Gabriel residence contained a compound, most likely aggregate, which was subjected to a chemical reaction. As the chemical reaction took place, a chemical compound larger than the original elements formed, resulting in internal expansion that caused the concrete to fracture and expand. . . . My opinion is based on my observations at the Gabriel residence and my previous experience investigating the cause of similar concrete deterioration characteristics in other locations where the concrete was reportedly supplied by Joseph J. Mottes Company of Stafford Springs, CT.

*Id.* at 3-4. He also stated that: "In my engineering opinion, the concrete basement walls were substantially structurally impaired. . . . The concrete walls can no longer be relied on to continue to perform their intended function of resisting the lateral pressures exerted on them by soil and water in the ground and for supporting the vertical loads of the wood-framed house." *Id.* at 4. As a result, Mr. Grandpré advised that "replacement" of the walls "is the only suitable fix." *Id.* at 5.

Liberty Mutual engaged a different engineer, Carl Cianci, to assess the state of the Gabriels' home. *See generally* Report by Carl Cianci (Cianci Report"), Def. SMF, Ex. N. Mr. Cianci also noted cracks in the concrete that were "indicative of a material defect in the concrete" used in constructing the house. *Id.* at 1. Like Mr. Grandpré, Mr. Cianci concluded that the cracking stems from a chemical reaction in the concrete. *Id.* at 4 (noting two causes suggested: Alkali Silica reaction or a reaction involving pyrrhotite). Mr. Cianci, however, stated that "[n]one of the cracks observed are due to an isolated or sudden event" and "[t]he insured's foundation is not in imminent danger of collapse, or in a state of collapse." *Id.* at 6. In contrast to Mr. Grandpré, Mr. Cianci concluded that "[t]he observed condition of the subject foundation is not a substantial impairment to the structural integrity of a building, as it is adequately supporting the structure with no immediate concern of imminent collapse." *Id.*

5

Liberty Mutual now moves for summary judgment on all of the Gabriels' claims. *See* Def. Mem. in Support of Mot. Summ. J. ("Def. Mem"), ECF No. 50. On Count I, Liberty Mutual argues that there has not been a breach of the company's contract with the Gabriels. First, according to Liberty Mutual, there has not been a "collapse" within the meaning of their insurance policy. The policy bars recovery for the collapse of the retaining walls and foundations and that these terms are unambiguous. Second, even if there was a "collapse," the Gabriels cannot prove that any such impairment occurred during the time period covered by the policy. Def. Mem. at 13; Def. Rep. Br. at 3, ECF No. 58. Alternatively, Liberty Mutual asks this Court to certify the question of what constitutes a "substantial impairment" to the Connecticut Supreme Court.

Liberty Mutual also moves for summary judgment on Count II and III, arguing that the Gabriels cannot demonstrate bad faith, and that liability was not reasonably clear such that they could be found liable under CUIPA or CUTPA.

## II. STANDARD OF REVIEW

The Court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48.

The Court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *Dufort v. City of New York*, 874 F.3d 338, 347 (2d Cir. 2017). The Court will not draw an inference of a genuine dispute of material fact from conclusory allegations or denials, *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011), and will grant summary judgment only "if, under the governing law, there can be but one reasonable conclusion as to the verdict," *Anderson*, 477 U.S. at 250.

## III. DISCUSSION

This case is one of numerous cases pending in the District of Connecticut involving crumbling concrete provided to homes from the JJ Mottes company. *See, e.g. Valls v. Allstate Ins. Co.*, No. 3:16-cv-1310 (VAB), 2017 WL 4286301 (D. Conn. Sept. 27, 2017); *Metsack v. Liberty Mut. Fire Ins. Co.*, 3:14-cv-1150 (VLB), 2017 WL 706599 (D. Conn. Feb. 21, 2017). Here, as in these other cases, the critical issue is whether Liberty Mutual's insurance policy covers the alleged damage to the Gabriels' basement walls. If there is no insurance coverage, then Liberty Mutual is entitled to summary judgment.

### A. Breach of Contract

Liberty Mutual argues that the Gabriels' claimed loss — the damage to the basement walls caused by the disintegrating concrete — is not within the scope of coverage provided under their insurance policy. Liberty Mutual further argues that the absence of coverage is sufficiently clear from the plain language of the contract that summary judgment should issue. The Court disagrees.

Under Connecticut law, "the terms of an insurance policy are to be construed according to the general rules of contract construction;" that is, the Court must discern the intent of the parties as articulated in the provisions of the policy. *Liberty Mut. Ins. Co. v. Lone Star Indus.,*

7

*Inc.*, 290 Conn. 767, 795 (2009). The Court reads the words of the policy with "their natural and ordinary meaning," and resolves any ambiguity in favor of the insured. *Wentland v. American Equity Ins. Co.*, 267 Conn. 592, 600-01 (2004). The Court must construe the contract language in favor of the insured unless the Court "has 'a high degree of certainty' that the policy language clearly and unambiguously excludes the claim." *Lone Star Indus.*, 290 Conn. at 796 (quoting *Kelly v. Figueiredo*, 223 Conn. 31, 37 (1992)).

"[T]he insured bears the burden of showing that an insurance coverage covers the loss, but the insurer bears the burden of showing that an exclusion applies to exempt it from covering a claim." *MBIA Inc. v. Fed. Ins. Co.*, 652 F.3d 152, 158 (2d Cir. 2011). The Court resolves any doubts in favor of the insured. *Id.* Whether a contract is unambiguous is a question of law for the Court, appropriately decided at the summary judgment stage. *Continental Ins. Co. v. Atlantic Cas. Ins. Co.*, 603 F.3d 169, 180 (2d Cir. 2010). If the Court finds that the contract is unambiguous, "the plain meaning of its terms control." *MBIA Inc.*, 652 F.3d at 158.

On the breach of contract claim, Liberty Mutual presents several arguments for summary judgment. First, under the "substantial impairment" standard applied by Connecticut courts, there has been no "collapse" under the Gabriels' insurance policy. To the extent that there is any doubt about the application of the "substantial impairment" standard, Liberty Mutual argues that this issue should be certified to the Connecticut Supreme Court for clarification. Second, even if a collapse occurred, it was not within a time frame covered by the Gabriels' Liberty Mutual policy. Finally, in any event, the Gabriels' Liberty Mutual policy unambiguously excludes damage to foundations or retaining walls and the basement walls at issue here qualify for these exclusions. The Court addresses each of these arguments in turn.

### 1. The Definition of "Collapse"

The Connecticut Supreme Court addressed the definition of "collapse" and held that, when not defined in an insurance policy, the word "include[s] coverage for any substantial impairment of the structural integrity of a building." *Beach v. Middlesex Mut. Assur. Co.*, 205 Conn. 246, 252 (1987).[1] Liberty Mutual agrees that the "undefined policy term 'collapse' includes coverage for any substantial impairment of the structural integrity of a building." Def. Mem. at 10 (citing *Beach v. Middlesex Mutual Assurance Co.*, 205 Conn. 246, 247 (Conn. 1987). Liberty Mutual, however, seeks to distinguish *Beach* in two different ways: (1) by imposing an imminence requirement; and (2) by suggesting that the substantial impairment standard articulated in *Beach* is ill-defined, and therefore requires the adoption of the Washington Supreme Court's definition, which requires the collapse to "renders such building or part of a building unfit for its function or unsafe." Def. Mem. at 15 (citing *Queen Ann Park Homeowners Ass'n v. State Farm Fire and Cas. Co*., 352 P.3d 790 (Wash. 2015)). Alternatively, in Liberty Mutual's view, the Court should certify the question to the Connecticut Supreme Court. Def. Mem. at 14. The Court disagrees.

The Connecticut Supreme Court's decision in *Beach* establishes that the damage to the Gabriel's basement walls could qualify as a "substantial impairment of the structural integrity of a building," an issue to be resolved by the finder of fact. In *Beach*, a trial referee made the relevant factual findings, rather than a jury. *See Beach*, 205 Conn. at 253 ("Having determined

---

[1] Significantly, in *Beach*, the plaintiffs had noticed a crack in the foundation wall of a building they owned, and sought coverage under an insurance policy that included coverage for "collapse" but excluded coverage for damages arising from "settling, cracking, shrinkage, bulging or expansion." 205 Conn. at 248. There, the insurance company argued that "collapse" should be interpreted one of two ways: first, requiring a "sudden and complete catastrophe" or, second, that reading the policy as a whole required it to be limited to "casualty of a sudden and cataclysmic nature," *id.*at 250-51, definitions rejected by the Connecticut Supreme Court. *Id.* at 252.

that the trial court was correct in its conclusion that this term [collapse] includes a substantial impairment of the structural integrity of a building, we need only note that the trial referee found, as a matter of fact, that the plaintiffs had proven such impairment of their house."). The defendant insurance company there could be held "liable even though no actual caving-in occurred and the structure was not rendered completely uninhabitable." *Id.*

Liberty Mutual argues that "the imminence of an actual collapse was a crucial element of the analysis in *Beach*." Def. Mem. at 11 n. 4. Based on the cases cited in *Beach*, Defendant argues that the Connecticut Supreme Court merely "transformed an 'actual collapse' into a substantial impairment of structural integrity' to avoid the imminent occurrence of an actual collapse." *Id.* at 12. It concludes that there must be an imminence requirement built into the *Beach* standard, and that Plaintiffs cannot show such imminent collapse here.

Defendant's argument finds no support in the *Beach* ruling. The Connecticut Supreme Court rejected the view that "'collapse' unmistakably connotes a sudden falling in, loss of shape, or flattening into a mass of rubble," *Beach,* 205 Conn. at 252, characterizing this view as one in "the distinct minority." *Id.* The court further noted that: "Requiring the insured to await an actual collapse would not only be economically wasteful, but would also conflict with the insured's contractual and common law duty to mitigate damages." *Id.* at 253 n.2. As a result, after *Beach*, the Connecticut Supreme Court joined with the "more persuasive authorities" in holding "that the term "collapse" is sufficiently ambiguous to include coverage for any substantial impairment of the structural integrity of a building." *Id.* at 252 (citations omitted).

On Liberty Mutual's motion for summary judgment, the inquiry therefore becomes whether the insurance company has met its burden and, viewing the facts in the light most favorable to the Gabriels, demonstrated that no jury could find such a substantial impairment has

10

occurred. *Cf. Roberts,* 264 F. Supp. 3d at 394 ("Because I conclude there is a genuine dispute of material fact with regard to whether the damage to the walls is covered under the policy, I deny Liberty Mutual's motion for summary judgment with respect to the Robertses' breach of contract claim."). The Court concludes it has not.

On this record, the parties engaged two engineers and they disagree about whether the damage to the Gabriels' home constitutes a substantial impairment. Mr. Grandpré, the Gabriels' engineer, notes that the walls "can no longer be relied on to continue to perform their intended function." Grandpré Report at 4. Additionally, he notes that the crumbling concrete has pushed up the floor joists in several places and bulged out in others, and considers it likely that this process will continue. Based on these observations, Mr. Grandpré concludes that the basement walls are "substantially impaired." *Id.* Liberty Mutual's expert disputes these conclusions, concluding that "[t]he observed condition of the subject foundation is not a substantial impairment to the structural integrity of a building, as it is adequately supporting the structure with no immediate concern of imminent collapse." Cianci Report at 6.

At this stage of the case, the Court's role is not to weigh the credibility of these two experts' testimony, and the other evidence in the record, "and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Because, on the record currently before this Court, a jury could conclude that the damage amounted to a substantial impairment, a genuine issue of fact remains for resolution at trial. *Accord. Roberts*, 2017 WL 3710062, at *13 ("Therefore, I conclude that the losses to the Robertses' basement walls are not excluded from coverage as a matter of law. Whether the Robertses have proved that their walls suffered a 'substantial impairment of [ ] structural integrity' remains a matter for the jury to decide." (alterations in original)); *Belz*, 204 F. Supp. 3d at 463-64 ("Accordingly, the

question of whether the damage was covered under the "collapse" provisions of the insurance policy cannot appropriately be resolved at the summary judgment stage and should be left for the jury."); *Metsack*, 2017 WL 706599, at *6 ("Viewed in the light most favorable to the Plaintiffs, a material issue of fact exists as to whether a covered collapse occurred before or during the period covered by the Liberty Mutual Policy.").

Liberty Mutual nevertheless, citing extensively to a hearing transcript in *Roberts v. Liberty Mutual Fire Insurance Co.,* 3:13-cv-00435, argues that the Connecticut Supreme Court's substantial impairment standard in *Beach* requires further clarification. *See* Def. Mem. at 14. Certification to the Connecticut Supreme Court therefore is warranted to "determine what the undefined phrase 'substantial impairment of structural integrity' means." Def Mem. at 14. Liberty Mutual also argues that this Court should adopt the reasoning of the Washington Supreme Court on the meaning of "substantial impairment." The Court disagrees.

Here, Liberty Mutual seems not to request certification because the definition of "collapse" is unclear: that term has already been defined in *Beach* as a substantial impairment of structural integrity. Certification is not appropriate in such circumstances where there is a controlling appellate decision. *See* Conn. Gen. Stat. Ann. § 51-199b(d) ("The Supreme Court may answer a question of law certified to it by a court of the United States or by the highest court of another state or of a tribe, if the answer may be determinative of an issue in pending litigation in the certifying court and if there is no controlling appellate decision, constitutional provision or statute of this state.").

Significantly, the Court in *Roberts* declined to certify the question. *See Roberts*, 2017 WL 3710062 at *4 n. 4. Likewise, in *Belz*, this Court noted that the Connecticut standard is "relatively clear" and found no "need for certifying this issue to the Connecticut Supreme

Court." 204 F. Supp. 3d at 464; *see also Metsack*, 2017 WL 706599 at *6 (agreeing with *Belz* and finding that "*Beach* supports finding certification inappropriate, because it treats the question of whether a house was "substantially impaired" as one of fact, not one of law.").

Similarly, courts in this District have considered, but have declined to adopt the Supreme Court of Washington's standard. In *Queen Anne Park Homeowners Assoc. v. State Farm Fire and Casualty Co.*, the Supreme Court of Washington defined "collapse" following certification of a question from the Ninth Circuit. It decided that "[c]ollapse" in the Policy means the substantial impairment of structural integrity of a building or part of a building that renders such building or part of a building unfit for its function or unsafe in a manner that is more than mere settling, cracking, shrinkage, bulging, or expansion." *Queen Anne Park,* 352 P.3d at 794 (Wash. 2015).

Defendant again requests that this court adopt the *Queen Anne Park* definition of collapse. But "Connecticut state and federal courts, however, consistently have declined to follow the reasoning of *Queen Anne* and like cases." *Roberts*, 2017 WL 3710062, at *8; *see also Belz*, 204 F. Supp. 3d at 464 ("The Court finds no reason to adopt Washington state law when the standard in Connecticut is relatively clear, nor is there a need for certifying this issue to the Connecticut Supreme Court."); *Metsack*, 2017 WL 706599, at *5 (finding "no reason to deviate" from approach in *Belz*.)

### 2. Timing

Liberty Mutual also argues that the damage is not covered because it occurred before the Gabriels owned the house. Def. Rep. Br. at 3. It notes that Mr. Grandpré suggested that the map cracking will present itself within ten to fourteen years after the concrete is poured, and that

because the home was built in 1984 this claim would be ripe between 1994 and 1998, well before Liberty Mutual began insuring the property. *Id.*

Put another way, Liberty Mutual does not just dispute whether there has been a substantial impairment, but when the damages would have amounted to a substantial impairment. Viewed this way, it is clear that the question of when the damage to the wall rose to the level a substantial impairment is a factual inquiry best left to the jury. *Accord Metsack*, 2017 WL 706599 at *6. ("Viewed in the light most favorable to the Plaintiffs, a material issue of fact exists as to whether a covered collapse occurred before or during the period covered by the Liberty Mutual Policy.")

### 3. The "Foundation" and "Retaining Wall" Exceptions

Finally, Liberty Mutual seeks to re-litigate the issue of whether the policy terms "foundation" and "retaining walls" are ambiguous. Def. Mem. at 19. Because the policy "excludes coverage for loss to a foundation or retaining wall unless the loss is a direct result of the collapse of the building," a finding that either of these terms unambiguously applied to the Gabriels' claim would bar recovery. *Id.*

The Court, however, already rejected Liberty Mutual's argument when considering its motion to dismiss in this case. This Court determined that these terms were ambiguous when ruling on the Defendants' motion to dismiss. *See Gabriel*, 2015 WL 5684063 at *3. In that decision, this Court noted that courts in the District of Connecticut repeatedly have "held that the terms 'foundation' and 'retaining wall' are ambiguous." *Id.* (citing *Bacewicz v. NGM Ins. Co.*, No. 3:08-cv-1530 (JCH), 2010 WL 3023882, at *1-4 (D. Conn. Aug. 2, 2010)*; Karas v. Liberty Ins. Corp.,* 33 F. Supp. 3d 110, 115-16 (D. Conn. 2014)*; Belz v. Peerless Ins. Co.,* 46 F. Supp. 3d 157, 164 (D. Conn. 2014)). The ambiguous terms should be construed against Liberty Mutual in

14

line with long-established principals of policy interpretation. *See Gabriel*, 2015 WL 5684063 at *3 ("Because these terms are ambiguous, the Court construes them in the Gabriels' favor, . . . , and concludes that the Gabriels have alleged plausibly that coverage exists for the damage to their basement walls and that Liberty Mutual breached the policy by denying coverage.")

Normally, "when a court has ruled on an issue that decision should generally be adhered to by that court in subsequent stages in the same case." *United States v. Carr*, 557 F.3d 93, 102 (2d Cir. 2009) (internal quotations omitted); *see also Belz,* 204 F. Supp. 3d at 463 (applying law-of-the-case doctrine to nearly identical policy language, procedural posture, and denying insurer's motion for summary judgment). A court may, however, reconsider its pass decision in certain "compelling circumstances, consisting principally of (1) an intervening change in controlling law, (2) new evidence, or (3) the need to correct a clear error of law or to prevent manifest injustice." *Carr*, 557 at 102.

Liberty Mutual argues that [t]he law-of-the-case-doctrine does not apply and substantial new evidence consisting of the utilization of the 'foundation' in connection with the problem of which the plaintiffs complain mandates a finding that 'foundation' is unambiguous." Def. Mem. at 22. The Court disagrees.

Liberty Mutual does not cite to any evidence the Court previously overlooked, although it asks the Court to accord legal weight to the way the terms are used by an online dictionary and television news reports, among other sources. Def. Mem. at 21, 26. Liberty Mutual also does not point to any way in which this Court's early decision was clearly erroneous or why reaching the same conclusion on summary judgment would cause manifest injustice.

Finally, Liberty Mutual has not shown any intervening change in controlling law. Instead, it cites almost exclusively to out-of-circuit precedents that predate this Court's earlier decision in

15

this case. *See* Def. Mem. at 22-26. Liberty Mutual also fails to address the now numerous-decisions in this District that have held these found these terms to be ambiguous when interpreting nearly identical policies. *See, e.g.*, *Belz*, 204 F. Supp. 3d at 463 (applying the law-of-the-case doctrine and concluding that the "terms "foundation" and "retaining wall" are ambiguous and subject to multiple reasonable interpretations."); *Metsack,* 2017 WL 706599 at *5 (applying law-of-the-case doctrine and reaffirming that foundation and retaining wall were ambiguous.); *Roberts*, 2017 WL 3710062 at *12-*13 (holding that "foundation" and "retaining wall" are ambiguous terms and construing them against Liberty Mutual).

As a result, this Court finds no reason to revisit its previous determination. Applying the law-of-the-case doctrine, the Court determines that both "retaining wall" and "foundation" are ambiguous and should be construed against Liberty Mutual. Ultimately, then, there remains material issues of fact – whether there has been a substantial impairment and when that impairment occurred – and the Gabriels' claim is not barred by any of the exclusions in the policy.

Liberty Mutual's motion for summary judgment with respect to Count I therefore is **DENIED**.

### B. Breach of the Covenant of Good Faith and Fair Dealing

Liberty Mutual also moves for summary judgment on Count II of the Complaint, which alleges breaches of the covenant of good faith and fair dealing. In Connecticut, "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *See Warner v. Konover*, 210 Conn. 150, 154 (1989); *Central New Haven Development Corporation v. La Crepe, Inc*., 177 Conn. 212, 217 (1979). Generally, establishing bad faith requires "both actual or constructive fraud, or a design to mislead or deceive another, or

16

a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." *Habetz v. Condon*, 224 Conn. 231, 237 (1992). Denying coverage in itself does not constitute bad faith where the insured's right to coverage is disputed. *American National Fire Ins. Co. v. Kenealy*, 72 F.3d 264, 271 ("[I]t is not bad faith for an insurer to fight liability when policy coverage is unclear."); *Ingersoll Milling Machine Co. v. M/V Bodena*, 829 F.2d 293, 309-10 (2d Cir. 1987). Normally, under Connecticut law, "[w]hether a party has acted in bad faith is a question of fact . . . ." *Renaissance Management Co. v. Connecticut Housing Financial. Authority*, 281 Conn. 227, 240, 915 A.2d 290 (2007).The Gabriels argue that the relevant point in time was when Liberty Mutual denied the claim, not as developed through counsel in the course of litigation. And Liberty Mutual should have known of problems related to JJ Mottes Concrete and the treatment of these claims by the courts. Liberty Mutual argues that there is no basis for claiming that it was put on notice. Def. Rep. Br. at 9.

While the decisions in the District have been clear regarding the breach of contract claims, the rulings have diverged in their treatment of alleged breaches of implied covenants. In *Metsack*, this Court allowed the implied covenant claims to proceed beyond summary judgment, finding "evidence that Liberty Mutual may have exercised bad faith in the investigation of the Metsacks' claim." 2017 WL 706599, at *8. The court concluded a reasonable juror could also find that Liberty Mutual had acted in bad faith by failing to consult an engineer and for not offering a sufficiently reasoned basis for its initial denial. *Id.* This Court in *Belz* allowed the implied covenant claims to proceed as well. *Belz*, 204 F. Supp. 3d at 468 ("Drawing all inferences in favor of the plaintiffs, a genuine factual dispute remains as to whether Peerless

denied the Belzes' claim with knowledge that the claim was covered under the policy. This dispute is central to the Belzes' bad faith claim.").

In *Roberts*, however, the Court concluded that "despite my rejection of Liberty Mutual's coverage position, I conclude that the evidence in the record is not sufficient for a reasonable jury to conclude that Liberty Mutual denied the Robertses' claim in bad faith." 2017 WL 3710062, at *14. The court noted that there was a weight of precedent suggesting that courts would reject Liberty Mutual's interpretations of the collapse and foundation provisions. The court noted, however, that that caselaw was not binding on other courts and that "until such time as those arguments are rejected by Connecticut's appellate courts or the Second Circuit, Liberty Mutual is entitled to continue making them." *Id.* at *13.

While a close case, Plaintiffs have not placed enough evidence in the record to suggest that this is more than a mere coverage dispute. As addressed above, courts in this District have denied summary judgment regarding the breach of contract claims, but most of those decisions postdate the denial of this claim. And, while Liberty Mutual should have been aware of existing Connecticut law that defined collapse in a way that might encompass the Gabriels' claim, the company might have in good faith considered their policy language different enough to warrant disputing coverage for this type of claim. Plaintiffs also have not placed testimony from Liberty Mutual employees in charge of claims processing in the record, or demonstrated that Liberty Mutual employees denied the claim in bad faith.

Given these considerations, there is not sufficient evidence in the record for a jury to conclude that Liberty Mutual denied the claim in bad faith. Summary judgment with respect to Count II therefore is **GRANTED**.

    C.    **CUIPA and CUTPA**

Finally, Liberty Mutual seeks to dismiss the claims under CUIPA and CUTPA, arguing that the Gabriels have failed to show that liability was clear and that there was a general business practice of denying these claims. Plaintiffs respond by arguing that liability was clear, and that Liberty Mutual had a policy of denying claims even when liability was clear.

Under the CUIPA and CUTPA, plaintiffs must demonstrate that an insurer engaged in "unfair settlement practices" with "sufficient frequency to indicate a general business practice." Conn. Gen. Stat. 38a-816(6); Conn. Gen. Stat. § 42-110a, et seq. Like the claims in Count II, courts in this District have diverged on addressing nearly identical claims contained in Count III. *Compare Belz*, 204 F. Supp. 3d 457 (D. Conn. 2016) (denying insurance company's motion for summary judgment on CUIPA claim because the plaintiffs cited three other matters where insurance company unfairly settled disputes with similar facts, and insurance the company did not provide evidence to contradict the plaintiffs' claim); *Metsack*, 2017 WL 706599, at *9 (finding a genuine issue of material fact as to whether the insurance company engaged in unfair business practice because "[i]n addition to offering evidence that Liberty Mutual did not sufficiently investigate their claim, Plaintiffs have offered evidence that Liberty Mutual and its affiliates have been involved in 19 separate lawsuits (including the instant case) involving the denial of claims arising from defective JJ Mottes concrete") *with Roberts*, 2017 WL 3710062 at *15 ("Here, I conclude that the existence of other nonbinding decisions that deemed Liberty Mutual potentially liable would not make it "reasonably clear" that Liberty Mutual actually was liable, and so could not persuade a reasonable jury to find that Liberty Mutual violated CUTPA/CUIPA.").

Here, as in *Roberts*, Plaintiffs have not put any evidence into the record supporting that Liberty Mutual had a general practice of denying these claims regardless of each claim's merit.

While there are several decisions denying summary judgment on similar policy language, as noted above, these decisions are non-binding and do not clearly establish liability. *See Roberts*, 2017 WL 3710062 at \*14 (noting summary judgment rulings only establish a factfinder could find insurer liable, not that insurer is actually liable). Plaintiffs do not support their CUTPA/CUIPA claim with any other record evidence, such as depositions with insurance company employees or other relevant individuals.

Given these considerations, there is not enough information in the record to allow a reasonable jury to conclude that Liberty Mutual violated CUTPA/CUIPA. Summary judgment with respect to Count III is therefore **GRANTED**.

## CONCLUSION

For the reasons addressed above, Defendant's motion for summary judgment is **DENIED** as to Count I and **GRANTED** as to Count II and III. This case will proceed to trial.

SO ORDERED this 29th day of December, 2017, in Bridgeport, Connecticut.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE